Patrick J. Richard (CA 131046)
prichard@nossaman.com
Janice Mock (CA 215168)
jmock@nossaman.com
James H. Vorhis (CA 245034)
jvorhis@nossaman.com
NOSSAMAN LLP
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600
Facsimile: 415.398.2438

Kevin Collins (CA 185427)
kcollins@nossaman.com
Nossaman LLP
915 L Street, Suite 1000
Sacramento, CA 95814
Telephone: 916.442.8888
Facsimile: 916.442.0382

Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COUNTY BANK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COUNTY BANK,<br><br>Plaintiff,<br><br>vs.<br><br>THOMAS T. HAWKER; JOHN J. INCANDELA; DAVE KRAECHAN; EDWIN JAY LEE; EDWARD J. ROCHA; AND DOES 1-50,<br><br>Defendant. | Case No:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

265328_2.DOC

Case No.

COMPLAINT

Plaintiff, Federal Deposit Insurance Corporation ("Plaintiff" or "FDIC-R") as Receiver for County Bank ("County" or "Bank") as and for its Complaint against Defendants alleges as follows:

## I. INTRODUCTION

1. This action is brought by the FDIC in its capacity as Receiver for County Bank. Pursuant to 12 U.S.C. § 1821(d)(2), the FDIC is the successor to all claims originally held by County Bank, and of any stockholder, member, account holder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution.

2. The FDIC-R brings this action against Defendants Thomas T. Hawker, John J. Incandela, Dave Kraechan, Edwin Jay Lee and Edward J. Rocha (collectively, "Defendants"). Each of these Defendants was an officer of the Bank, with both direct and indirect responsibility for the Bank's lending policies and the specific lending decisions described herein. Each of the Defendants is sued for conduct as an officer of the Bank. Defendants each served on the Bank's Executive Loan Committee ("ELC"). Defendants breached their duties to County in connection with the Bank's commercial and real estate development loans and lending practices. As a result of Defendants' negligence and breaches of their fiduciary duties, Defendants caused or allowed County to make imprudent real estate loans, typically for the construction and development of residences, for which County Bank suffered losses in excess of $42 million. Pursuant to its authority under 12 U.S.C. § 1821, FDIC-R seeks to recover these losses and such losses as may be proven at trial from Defendants.

3. The Bank's losses from its commercial real estate lending practices stem from significant departures from safe and sound banking practices.

4. Management repeatedly disregarded the Bank's credit policies and approved loans to borrowers who were not credit worthy and/or for projects that provided insufficient collateral and guarantees for repayment. The Bank's compensation plans for its management and account officers encouraged them to push for growth in loan

production volume with little regard for credit quality.

5. The Bank's commercial real estate department continued to follow a strategy of growth at the tail-end of the longest appreciating real estate market in over four decades. The Bank's management pushed to grow loan production despite their awareness that significant market changes required more stringent underwriting, not departures from prudent lending standards. Indeed, management unwisely continued risky commercial real estate lending in a deteriorating market even after becoming aware of the market decline.

6. As detailed herein, the poor lending practices are exemplified by 12 loans made between December 2005 and June 2008, for which losses exceed $42 million.

## II. BACKGROUND

### A. The Bank's Operations and Warnings from the Market

7. Established in 1977 as a state-chartered nonmember bank,[1] County was headquartered in Merced, California, and wholly owned by Capital Corporation of the West, a publicly-traded, one-bank holding company. Historically, County Bank's primary business focused on tract residential construction lending in the Central Valley of California.

8. During late 2005 through mid 2008, Defendants caused County to pursue rapid growth through risky Construction and Land Development loans ("CLD" or sometimes "ADC" for Acquisition, Development and Construction loans) and Commercial Real Estate loans ("CRE"). These types of loans are known to be more speculative than other types of loans because, among other reasons, of the lack of a

---

[1] A state-chartered nonmember bank means any state bank that is not a member of the Federal Reserve System. *See* 12 U.S.C. §1813(e). Such banks are regulated by both the FDIC and the applicable state banking authority, which in this case is the California Department of Financial Institutions ("CDFI").

present cash flow source, uncertainties of development and sale, and the need for adequate secondary sources of repayment. Prudent lending in this segment of banking requires sound underwriting, timely evaluation and response to economic trends impacting the industry, and strict adherence to prudent lending policies and standards.

9. Defendants' conduct caused rapid growth of riskier loans, deficient underwriting, and excessively high concentrations in CRE/CLD/ADC loans. From January 1, 2004, to December 31, 2007, County's assets grew 38.5 percent from $1.3 billion to $1.8 billion, CRE loans grew 51.2 percent from $430 million to $650 million, and the CLD component of its CRE loans almost tripled from $85 million to $248 million. County's concentration in CRE loans in 2005 was 568 percent of its Tier 1 Capital and, by the end of 2008, its CRE loan concentration was 749 percent of capital, ranking it in the 93d percentile of its peer group institutions.

10. Concentrating a loan portfolio in CRE/CLD/ADC loans increases a bank's risk for numerous reasons, including: (a) concentration in *any* sector of the economy increases risk resulting from that sector's downturn; (b) the housing market, in particular, is cyclical by nature; (c) the primary source of repayment is cash flow from sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high CRE/CLD/ADC concentrations. In short, concentrations of CRE/CLD/ADC loans in the volatile commercial real estate market render a bank vulnerable to changes in market condition and require vigilant adherence to sound lending practices. It is imperative that the known risks inherent in such a high loan concentrations be managed by, at a minimum, management oversight, strategic planning, underwriting, risk assessment and monitoring of CRE/ADC loans, portfolio risk management, management information systems, market analysis, and stress testing.

11. The Bank's internal loan policies required loan approval criteria reflecting prudent lending, including, but not limited to, the following requirements:

- Each loan must be supported by a sound cash flow analysis.
- Loans will be made only to developers with financial staying power and "the

ability to meet changing economic conditions."

- The borrower is required to contribute at least 20 percent of project costs from the borrower's own funds.

- A commercial construction sensitivity analysis is required and must include an analysis of vacancy rates and economic conditions.

- Financial analyses must include "what if" scenarios affecting cash flow stability.

- A comparison of actual cash flow with projected cash flow is required.

- A secondary source of repayment must be available to support loan repayment if the primary repayment source becomes unavailable.

- CLD loans require a payment by the borrower of 125 percent of the allocated loan amount for a partial release of mortgaged property.

12. Defendants knew or should have known that the Bank was pursuing the risky development loans in a limited geographic area at a time when they should not have favored growth over prudent lending practices. Home price appreciation in California peaked in the year-ending *first quarter* 2005 and declined sharply thereafter. By mid-2005, the "housing bubble" was widely discussed and documented. The Bank's own Credit Authorization reports for proposed loans noted the worsening market and that the rate of home sales (a critical factor for evaluation of a CLD loan) worsened "starting the second half of 2005."

13. By 2006 one board member expressly observed and warned CEO Hawker that developers were already pulling back. In a communication to Hawker, for example, copied to the Board in June 2006, Director Tahajian cautioned that the Bank was operating in the context of a housing slowdown, declining stock prices of home builders, builders pulling back on land acquisition, and the Bank's high exposure to developers. He recommended greater vigilance in understanding what the Bank's existing borrowers were doing in the market. Tahajian also expressed concern about delayed loan payments, downgrading of loans, and an increase in loan loss reserves. None of the defendants took

any action in response to Tahajian's expressed concerns and instead continued to increase the Bank's CLD loans.

14. County's CLD borrowers as a group were highly leveraged. By early and mid-2007 the real estate market in the Central Valley was in steep decline. Many of County's CLD borrowers were not able to service their debts to County. However, Hawker delayed action to reclassify loans, write loans down, and/or take charge-offs. CLD loans were renewed or extended with no principal pay-down even as collateral values declined. This masked bad loans and delayed recognition of losses.

15. In late 2007 the Board discovered that Hawker had withheld material information from the Board about delinquent loans and associated losses. In January 2008 the Board relieved Hawker of many of his duties as CEO. Hawker resigned on March 25, 2008. The Bank failed on February 6, 2009 and the FDIC was appointed receiver.

### III. JURISDICTION AND VENUE

16. The Court has original jurisdiction of this action pursuant to 12 U.S.C. § 1819(a) and 12 U.S.C. §§ 1821(d) and (k). This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1345. Pursuant to 12 U.S.C. § 1821(d)(14)(A) and (B), the FDIC has timely brought these claims within three years of the Bank's failure and appointment of the FDIC as receiver. The loans at issue were not subject to default notices more than two years before the Bank's failure. There is also an equitable tolling because the defendants' control of the ELC made earlier discovery impossible. Defendants' control of the ELC and of top management prevented plaintiff's predecessors in interest from bringing an action to redress the wrongs set forth herein.

17. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of California because the claims and causes of action asserted in this Complaint arose in this district.

IV. **PARTIES**

A. **Plaintiff**

18. FDIC-R is a corporation and an instrumentality of the United States, authorized to sue and complain in any court of law or equity, state or federal, by act of Congress pursuant to 12 U.S.C. §§ 1821(d)(2) and (k). When County Bank failed on February 6, 2009, FDIC-R accepted the appointment as Receiver and thereby became possessor of all the assets, business and property of the Bank including all claims, rights and causes of action against the named Defendants by virtue of their failure to adhere to their fiduciary duties on behalf of the Bank.

B. **Defendants**

19. Thomas T. Hawker ("Hawker") was Chief Executive Officer of the Bank from 1991 until it failed and President from 1991 until December 2005. He also was a director and a member of the DLC from 1991 until he resigned as a director on August 19, 2008. As of September 30, 2008, he owned or controlled 167,141 shares of 1.55 percent of Capital Corporation of the West ("CCOW") stock.

20. John J. Incandela ("Incandela") was the Bank's Executive Vice President and Chief Credit Officer from June 20, 2005, until the Bank failed. He was a member of the ELC and the Management Loan Committee ("MLC") and as of September 30, 2008, owned or controlled several thousand shares of CCOW's stock.

21. Dave Kraechan ("Kraechan") was a Senior Vice President and Chief Lending Officer from January 1, 2001, until the Bank failed. He was a member of the ELC.

22. Edwin Jay Lee ("Lee") was a Senior Vice President and Bank Credit Administrator from April 6, 1998, until the Bank failed. He was a member of the ELC and MLC.

23. Edward J. Rocha ("Rocha") was hired as Chief Operating Officer on May 1, 1995. He became the Bank's President in December 2005 and remained as President and COO until the Bank failed. He was a member of the ELC, MLC, and the Director's Loan

Committee ("DLC"). As of September 30, 2008, he owned or controlled 32,883 shares or 0.30 percent of CCOW's stock.

## V. DEFENDANTS' DUTIES TO THE BANK

24. Defendants, as officers of the Bank, owed to the Bank under California law the duty to manage the Bank in a safe and sound manner, especially with respect to the review and correction of the Bank's actual lending practices and approval of proposed development loans reflected in the Bank's portfolio of CLD and ADC loans. Defendants assumed the duties of officers to act in a reasonably prudent and non-negligent manner, consistent with the standard of care for reasonable bank officers of a depository institution. Defendants were managing a depository bank, not operating a hedge fund. Defendants were also fiduciaries of the Bank, and owed to the Bank the highest duty of good faith to put the Bank's welfare and the Bank's interest ahead of their own pecuniary interest as existing or potential shareholders of the Bank's holding company.

## VI. FACTUAL ALLEGATIONS

25. Each of the Defendants breached their duties to the Bank in several important ways. Defendants' conduct fell below the standard of care because defendants approved and permitted imprudent loans that violated the Bank's own lending policies. The poor lending practices include substandard evaluation of proposed projects, borrowers, contractors and guarantors. Loan files lacked sensitivity analyses, failed to include sound cash flow analyses, failed to evaluate "what if" scenarios affecting cash flows, failed to compare actual cash flows against *pro forma* projections, and failed to specify secondary repayment sources. Loans also were granted to developers without established staying power. Payment amounts by borrowers for partial releases of mortgaged property for CLD loans were less than 125 percent of the allocated loan amount. Borrowers failed to contribute required equity. Twelve loans that provide specific examples of these significant and wide-spread lending failures are described below.

26. Defendant Thomas T. Hawker, as the Chief Executive Officer and a member of the Executive Loan Committee failed to adhere to the standard of care by approving high risk loans that did not conform to the Bank's underwriting standards. He did so to pursue a goal of unreasonable growth at a time when market conditions and warnings from his own Board of Directors and others highlighted the need for prudent lending practices. The 12 exemplar loans provide specific examples of imprudent lending decisions made upon the approval and knowledge of Hawker that caused over $42 million of damages to the Bank.

27. Defendant John J. Incandela was the Bank's Executive Vice President and Chief Credit Officer from June 2005 until the Bank failed. He was also a member both the ELC and MLC. Incandela breached his duty to the Bank by agreeing to implement Hawker's goal of growth over safe and sound banking, and the numerous lending violations reflected in the exemplar loans.

28. Defendant Dave Kraechan, as a Senior Vice President and Chief Lending Officer from January 2001 until the Bank failed, and as a member of the ELC, owed a duty to the Bank to ensure that the Bank's lending policies were followed and to take reasonably prudent steps to ensure that the Bank did not make imprudent loans as part of a plan to unreasonably grow this small community bank. Defendant Kraechan breached these duties with respect to the approval of most of the exemplar loans.

29. Defendant Jay Lee, as a Bank Credit Administrator from April 1998 until the Bank failed and as a member of both the ELC and MLC, owed duties to the Bank to act in a non-negligent manner regarding the Bank's lending policies and the applicable standard of care for prudent loans. He breached these duties by, among other things, approving all but two of the subject loans, and failing to observe key requirements of the Bank's lending policies and standard of care, including the requirements for a reasonable financial analysis of the prospective borrower and project.

30. Defendant Edward J. Rocha as Chief Operating Officer and President from 2005 until the Bank failed, and as member of the ELC, MLC and DLC, owed a duty of

highest care to the Bank to take all reasonable steps necessary to ensure the Bank's adherence to safe and sound banking practices. Rocha breeched these duties, and abdicated these responsibilities, both in the loan approval process for the exemplar loans, and failing to reasonably take steps to assure himself that the Bank's key lending and underwriting functions were adequately staffed with competent, well-trained personnel.

31. On January 11, 2007, for example, Hawker and the other members of the ELC approved a real estate-secured A&D loan to Merced Paseo, LLC in the amount of $9.58 million. The loan was guaranteed by Todd Bender and David Zacharias (Zacharias Family Trust). This loan violated the Bank's loan policy in several respects. The loan maturity date, an essential assumption regarding the repayment of the loan, was neither credible nor realistic based on the Bank's own sales projections. The Bank's appraisal noted that the Project did not have an approved and recorded final subdivision map; portions of the property were located in a FEMA flood zone; a small-lot residential development was known to be an untested concept in the local marketplace; and the residential market was, by February 2007, characterized as "soft." No adequate financial analysis of the ability of the borrower or guarantors to repay the loan was performed, contrary to the Bank's lending policy, and the repayment source was not adequate to amortize the debt. The loan was not even guaranteed by all of the persons and entities having an ownership interest in Merced Paseo LLC, again contrary to the Bank's loan policy and prudent lending standards. Two years after the loan was approved, the development consisted of 130 vacant lots and 6 model homes; none of the lots had been presold. The Bank's loss stands at $6.85 million on this single loan. Unfortunately, these departures from the standard of care for prudent lending practices were not unique to the loan given to Merced Paseo LLC.

32. On or about April 17, 2007, members of the MLC approved a refinance and land acquisition loan to El Dorado Corners, LLC and Tres Piedras, LLC in the amount of $11.176 million. The loan was guaranteed by Peter Daru, Judy Daru, Warren Trumbly, and Linda Trumbly This loan also violated the Bank's loan policy and prudent lending

265328_2.DOC    - 9 -    Case No.
COMPLAINT

standards in several respects. For example, the Bank had already noted the dramatic change in the local real estate market, the slowing of home building, the accumulation of inventory by the time of this lending decision. At a time when prudent lending required reduced lender participation and stricter underwriting, the Bank ignored those guidelines and agreed to this ill-conceived loan that had been declined by Umpqua Bank. Further, the Bank included and over-valued anticipated profits from the undeveloped project as current equity in evaluating the principals' financial statements and financial staying power, a key lending criterion under the Bank's applicable loan policy. The Credit Authorization documents reflect both mathematical errors and information establishing numerous shortcomings of the loan. The loan also violated the Bank's Real Estate Loan policy by relying on insufficient guarantees. The Bank's loss stands at $5.97 million on this single loan.

33. On September 14, 2006 members of the ELC approved a loan to Ronald J. Malik in the amount of $7 million and had also approved a loan of $9.97 million to Malik. The loans were not guaranteed at the time whye went through the credit approval process, a violation of the Bank's lending policies and prudent lending standards. Further, the Bank relied on inadequate secondary and tertiary sources for repayment in evaluating the principal's financial statements and financial staying power, a key lending criterion under the Bank's applicable loan policy. The Bank's losses on those two loans stand at $0.30 and $4.75 million, respectively.

34. On December 14, 2006, members of the ELC approved a real estate-secured A&D loan to Monte Carlo, LLC in the amount of $15.45 million. The loan was guaranteed by Terry L. Moreland Inc. and Terry & Peggy Moreland. This loan also violated the Bank's loan policy in several respects. As one example, the Bank included and over-valued anticipated profits from the undeveloped project as current equity in evaluating the principals' financial statements and financial staying power, a key lending criterion under the Bank's applicable loan policy. Several loan committee members expressly recognized the unacceptable risks, including market conditions and numerous

265328_2.DOC                                - 10 -                                Case No.
COMPLAINT

unknown variables surrounding the proposed development. The Bank's loss stands at $4.45 million on this single loan.

35. In 2005, five total loans in the collective amount of $19,032,000 were made to Steve Enad, Kota Shekar, and other related individuals and entities, including Shen LLC, to help finance the purchase of a 25.64 acre parcel of commercial real estate. Those loans can be broken into two distinct groups. On or about September 28, 2005, members of the DLC approved a loan for $10,920,000 to Shen LLC. The loan was guaranteed by Steve Enad and Kota Shekar, who were the members of the LLC. On November 18, 2005, members of the MLC and DLC then approved the following four loans: $840,000 to Steve G. Enad and Teresita S. Enad, $1,100,000 to Steve Enad and Kota Shekar; $4,300,000 to Kota C. Shekar and Lakshmi J. Nemana; $1,872,000 to Steve Enad. These loans also violated the Bank's loan policy in several respects, including the evaluation of the project and the secondary and tertiary sources of repayment. The Bank's loss stands at $4.20 million on this collective loan.

36. On December 13, 2005 and June 21, 2007, members of the MLC approved loans to Jackson View, LLC in the amount of $9.69 and 6.23 million, respectively. The $5.94 million loan was guaranteed by M.A. Steiner Development, Martin A. Steiner, and Eland Construction, Inc. The Jackson View loans were particularly troublesome because the Bank had taken over for another bank's development loan in a slowing market where critical indicators had all turned negative. Bank personnel described this high-risk loan as a "mistake" on an over-sized project to a developer with no money. The Bank's losses on those two loans stand at $1.17 and $3.96 million, respectively.

37. On or about May 3, 2006, members of the MLC approved a loan to Carson Creek in the amount of $10.65 million. The loan was guaranteed by Brian N. McCarthy, Richard A. Conto, and Southfork Development Group. The loan also violated the Bank's loan policy in several respects. For example, the borrower put no equity into the development project, and had no relevant building experience. The project itself was grossly flawed, in a poor location with an oversized budget. The Bank's loss stands at

$3.96 million on this single loan.

38. On September 14, 2006, members of the ELC approved a loan to Ramson Piro in the amount of $3.29 million for "bonding" despite a stated policy of the Bank not to provide bonding insurance for labor and materials on a construction project. The ELC also approved a $4 million construction loan to Piro's construction firm, Piro Enterprises, in late 2006 despite the ELC, including Incandela, noting one month earlier the "housing bust." These loans also violated the Bank's loan policy in several respects, including the evaluation of the project and the secondary and tertiary sources of repayment. There appears to be no guarantor on bonding loan, again a violation of the Bank's lending policy and prudent lending practices. The Bank's loss stands at over $2.79 million on these loans.

39. On June 8, 2006, members of the ELC approved a loan to Rocklin Partners, LLC in the amount of $9.90 million. The loan was guaranteed by Carl C. Nielsen and Alan M. Schwartz. The Bank's evaluation and approval of this loan also fell below the standard of care as to both the evaluation of the proposed project and the secondary and tertiary sources of repayment. The Bank's loss stands at $2.65 million on this single loan.

40. On June 1, 2006, members of the ELC approved two loans to Steve G. Enad in the collective amount of $2.44 million. The Bank relied on inadequate financial support as to the primary and secondary sources of repayment of these loans at a time when the Bank's outstanding credit to Enad and related borrowers was overextended, under collateralized and highly concentrated in high risk development loans. The Bank's losses on those loans stand at $1.65 million, collectively.

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Negligence (California law)**
**(Against All Defendants)**

41. FDIC-R realleges and incorporates by reference each of the allegations

contained in paragraphs 1-40 of this Complaint, as though fully set forth herein.

42. Defendants, acting their capacity as officers of County Bank, owed to the Bank the duty to use reasonable care, skill and diligence in the performance of their duties, especially in connection with the Bank's commercial real estate and development lending functions, including the duty to supervise adequately those employees of the Bank under their supervision and responsibility.

43. Each of the Defendants was negligent by abdicating his responsibilities to the Bank, unreasonably failing to investigate material facts, failing to use his business judgment in carrying out his responsibilities to the Bank, and ignoring the danger the negligence was causing to the Bank, as further described in this Complaint, in connection with the Bank's commercial lending functions. These breaches of duty are exemplified by the loans described herein.

44. As a direct and proximate result of Defendants' negligence, the Bank suffered damages in an amount to be proven at trial in excess of $42 million.

## SECOND CLAIM FOR RELIEF

### Breach of Fiduciary Duties (California law)
### (Against All Defendants)

45. FDIC-R realleges and incorporates by reference each of the allegations contained in paragraphs 1-45 of this Complaint, as though fully set forth herein.

45. Defendants owed County Bank the fiduciary duties of due care, loyalty, and to act in good faith and in the best interests of the Bank.

45. Each of the Defendants failed to discharge his fiduciary duties and to adhere to policies, laws and regulations, as further described in this Complaint.

45. As a direct and proximate result of Defendants' breaches of their fiduciary duties, the Bank suffered damages in an amount to be proven at trial in excess of $42 million.

## VIII. REQUEST FOR RELIEF

WHEREFORE, FDIC-R requests for relief against Defendants as follows:

A. For compensatory and consequential damages, jointly and severally, in a minimum amount of $42 million and any excess amount to be proven at trial;

B. For its costs of suit against all Defendants;

C. For prejudgment interest;

D. For attorneys' fees, costs for the investigation and litigation, and interest; and

E. For such other and further relief as this Court deems just and proper.

DATED: January 27, 2012

NOSSAMAN LLP
Patrick J. Richard
Janice Mock
Kevin J. Collins
James H. Yorbis

By: /s/ Patrick J. Richard
Patrick J. Richard
Attorneys for Plaintiff
FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COUNTY BANK